**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION MDL | MDL No.<br>2:18-mn-2873-RMG |

| | |
|---|---|
| COUNTY OF ROCKLAND, individually and on behalf of all others similarly situated, | 2:20-cv-572-RMG |
| *Plaintiff,* | |
| *-against –* | **VERIFIED COMPLAINT** |
| 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., BUCKEYE FIRE EQUIPMENT COMPANY, CHEMGUARD, INC., TYCO FIRE PRODUCTS L.P., NATIONAL FOAM, INC., ANGUS INTERNATIONAL SAFETY GROUP, LTD, ANGUS FIRE ARMOUR CORPORATION, E.I DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise, THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise, CORTEVA, INC., DUPONT DE NEMOURS INC., f/k/a DOWDUPONT, INC., ARCHROMA MANAGEMENT LLC, ARKEMA INC., ARKEMA FRANCE, S.A., AGC, INC. f/k/a ASAHI GLASS CO. LTD., DAIKIN INDUSTRIES LTD., DAIKIN AMERICA, INC., DYNAX CORPORATION, SOLVAY SPECIALTY POLYMERS, USA, LLC., AMEREX CORPORATION, KIDDE-FENWAL, INC., KIDDE, P.L.C., INC., UTC FIRE & SECURITY AMERICAS CORPORATION, INC., UNITED TECHNOLOGIES CORPORATION, CHUBB FIRE LTD., CLARIANT CORPORATION, and BASF CORPORATION, | **Jury Trial Demanded** |
| *Defendants.* | |

Plaintiff, COUNTY OF ROCKLAND, by and through its attorneys, Napoli Shkolnik

PLLC, hereby files this Class Action Complaint, individually, and on behalf of all other municipal

public entities which own firefighter training facilities within the State of New York and which

1

have incurred or will incur financial damages as a result of contamination associated with the use and/or storage of aqueous film-forming foam at these facilities, and alleges as follows:

## I.    NATURE OF THE CASE

1.     This action arises from the foreseeable contamination surface and groundwater in and around firefighter training facilities ("FTFs") due to the use of Defendants' aqueous film-forming foam ("AFFF") that contained per- and poly-fluoroalkyl substances ("PFAS"), including perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA").

2.     Plaintiff, and other municipal public entities which own FTFs, are now forced to incur significant costs for the environmental testing, investigation and remediation of these properties, in order to mitigate the impacts of the toxic and carcinogenic chemicals that are contained in Defendants' AFFF.

3.     Plaintiff, and all others similarly situated, will also incur additional costs associated with the off-site impacts of the PFAS contaminated water migrating from their FTFs, including sampling, remediation, and legal costs.

4.     AFFF is a product that has been used to extinguish fires involving fuel or other flammable liquids.

5.     Defendants designed, manufactured, marketed, and sold AFFF to numerous public and private entities, including fire departments, fire training centers, and other locations with firefighting needs, knowing that it would be discharged into the environment and inevitably contaminate surface water and groundwater drinking supplies throughout the State of New York (United States).

6. Defendants knew or should have known that their AFFF containing PFAS posed a foreseeable threat to surface water, groundwater and public water supplies because these chemicals do not biodegrade, move easily in water, and are expensive to treat.

7. Nevertheless, the Defendants marketed and sold AFFF with the knowledge that PFAS would be released into the environment in firefighting training exercises and in firefighting emergencies.

8. Human exposure to PFOA is associated with an increased risk of kidney and testicular cancer, ulcerative colitis, and other conditions. Human exposure to PFOA and PFOS is associated with an increased risk of immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, and other adverse health conditions.

9. Plaintiff, individually and on behalf of the Classes, brings this action to recover damages incurred and to be incurred in investigating, monitoring, remediating, and otherwise responding to the contamination caused by the use of Defendants' AFFF products at FTFs in New York State.

10. Plaintiff, and others similarly situated, should not have to bear these costs; they should be borne by the Defendants, who are responsible for the PFAS contamination.

## II.    JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over the Defendants pursuant to 28 U.S.C. §1332(a), in that this action seeks monetary relief in excess of the sum or value of $ 75,000, exclusive of interest and there is complete diversity between the parties.

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions by Defendants giving rise to the claims asserted herein occurred in New York and

caused harm to the Plaintiff, the County of Rockland, a municipal corporation, located in the Southern District of New York.

13.     At all relevant times, Defendants conducted business throughout the United States, including in the Southern District of New York and in Rockland County.

14.     Pursuant to the case management orders of this Court in MDL No. 2:18-mn-2873-RMG (CMO 3), this complaint is being filed directly with the District Court for the District of South Carolina, Charleston Division.

### III.    THE PARTIES

#### A. Plaintiff and the Class

15.     The County of Rockland ("Rockland" or "Plaintiff") is a municipal corporation with its primary place of business at 11 New Hempstead Road, New City, New York 10956.

16.     In carrying out its powers, purposes and duties, Plaintiff is acting in all respects for the benefit of the people of the Rockland, for the protection of their health, welfare, and prosperity.

17.     Plaintiff owns and operates the Rockland County Fire Training Center (the "Site") located at 35 Firemen's Memorial Drive, Pomona, Town of Ramapo, Rockland County.

18.     The Site consists of 24.3 acres and includes a complex of municipal buildings on the eastern half of the property and a fire training area in the western portion.

19.     The fire training area includes several structures and abandoned vehicles used by local fire departments for training exercises.

20.     The groundwater in and around the Site has been contaminated by AFFF containing PFAS.

21.     PFAS was an integral part of aqueous film-forming foam ("AFFF") that was used for decades during operations and fire training sessions at the Site beginning in approximately the 1990s through at least 2016.

22.     New York State's investigation has shown that AFFF products containing PFAS, manufactured and/or distributed by Defendants, were stored and used at the Site.

23.     Sampling at or around the Site has shown contamination by PFAS, with a detection of 39 parts per trillion ("ppt") in a private drinking water source and concentration of 27 ppt in a public drinking water source.

24.     On December 18, 2018, the New York State Department of Environmental Conservation notified Plaintiff that the Site is considered a Potential Hazardous Waste Disposal Site (Class P on the State Superfund Program's Registry of Inactive Hazardous Waste Disposal Sites).

25.     Plaintiff has incurred and reasonably expects to incur additional costs in connection with PFOA/S contamination at this site, including costs associated with continuing investigation and remediation efforts, as well as legal costs.

26.     FTFs throughout the State of New York have been contaminated by AFFF containing PFAS manufactured and/or distributed by the Defendants.

27.     Plaintiff brings this action on behalf of itself, and as a representative of all municipal public entities which own FTFs within the State of New York and which have incurred or will incur financial damages as a result of PFAS contamination associated with the use and/or storage of AFFF at these facilities, including all future monitoring costs.

B. **Defendants**

28.     The term "Defendant" or "Defendants" refers to all Defendants named herein jointly and severally.

29.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment or agency.

30.     At all times relevant to this litigation, each of the Defendants conducted business throughout the United States, including in New York.

31.     At all times relevant to this litigation, each of the Defendants designed, developed, manufactured, marketed and sold AFFF products containing PFAS and used at FTFs, including at the Site.

32.     At all times relevant to this litigation, Defendants were legally responsible for and committed each of the tortious and wrongful acts alleged in this Complaint.

33.     **3M Company f/k/a Minnesota Mining and Manufacturing Co. ("3M Company")** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55144.

34.     Beginning before 1970 and until at least 2002, 3M Company manufactured, distributed, and sold AFFF containing PFAS.

35.     **Buckeye Fire Equipment Company ("Buckeye")** is a corporation organized and existing under the laws of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

36.     **Chemguard, Inc.** is a corporation organized and existing under the laws of Texas, with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

37.     Beginning in or around 1994, Chemguard began manufacturing AFFF that contained PFOA.

38.     On information and belief, Chemguard is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

39.     **Tyco Fire Products L.P. ("Tyco")** is a limited partnership organized under the laws of Delaware, with its principal place of business at 1400 Pennbrook Parkway, Landsdale, Pennsylvania 19446.

40.     On information and belief, Tyco is a subsidiary of Johnson Controls International PLC, an Irish public limited company listed on the New York Stock Exchange.

41.     Tyco is the successor in interest of The Ansul Company ("Ansul"), having acquired Ansul in 1990.

42.     Beginning in or around 1975, Ansul manufactured and/or distributed and sold AFFF that contained PFAS. After Tyco acquired Ansul in 1990, Tyco/Ansul continued to manufacture, distribute and sell AFFF that contained PFAS.

43.     On information and belief, Tyco acquired the Chemguard brand in 2011 and continues to sell Chemguard products through its Chemguard Specialty Chemicals division.

44.     **National Foam, Inc.** ("National Foam") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501 and at 350 East Union Street, West Chester, Pennsylvania 19382.

45.     On information and belief, National Foam is a subsidiary of Angus International Safety Group, Ltd.

46.     **Angus International Safety Group, Ltd.** is a foreign private limited company, with offices at Station Road, High Bentham, Near Lancanster, United Kingdom LA2 7NA.  Upon information and belief, Angus International is registered in the United Kingdom with a registered number of 8441763.

47.     **Angus Fire Armour Corporation** ("Angus Fire") is a corporation organized and existing under the laws of Delaware, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501.

48.     On information and belief, Angus Fire is a subsidiary of Angus International Safety Group, Ltd.

49.     **E.I. DuPont de Nemours & Company ("DuPont")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road Wilmington, Delaware 19805.

50.     DuPont is a successor in interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), a Delaware corporation with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

51.     DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

52.     In a letter addressed to the Office of Pollution Prevention and Toxics (OPPT) Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its Telomer-based sales products in the United States for the year 2002.

53.     The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[1]

54.     **The Chemours Company ("Chemours")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street, Wilmington, Delaware 19889.

55.     Chemours is a successor in interest to DuPont Chemical, as described above.

56.     **The Chemours Company FC LLC ("Chemours FC")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1007 Market Street Wilmington, Delaware 19899.

57.     Chemours FC is a successor in interest to DuPont Chemical, as described above.

58.     **Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Rd., Wilmington, Delaware 19805.

59.     **Dupont de Nemours Inc**. **f/k/a DowDuPont, Inc. ("Dupont de Nemours Inc.")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 974 Centre Road, Wilmington, Delaware 19805 and 2211 H.H. Dow Way, Midland, Michigan 48674.

---

[1] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621.

60.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva.

61.     Corteva was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

62.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva common stock by way of a pro rata dividend. Following that distribution, Corteva became the direct parent of E. I. Du Pont de Nemours & Co.

63.     Corteva holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

64.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont ("New DuPont"). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva.

65.     Defendants E. I. Du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

66.     **Archroma Management LLC ("Archroma")** is a foreign corporation existing under the laws of the country of Switzerland and having a principal office at Neuhofstrasse 11, 4153 Reinach, Switzerland.

67.     Archroma is a provider of dyes and specialty chemicals serving textiles, packaging, paper, coatings, adhesives and sealant markets.

68. In 2013, it acquired the Textile Chemicals, Paper Specialties, and Emulsions businesses from Clariant Corporation in 2013, a successor to Sandoz Chemical Corporation, both of which conducted business in New York.

69. **Arkema Inc.** is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

70. Arkema Inc. develops specialty chemicals and polymers.

71. Arkema, Inc. is an operating subsidiary of defendant, Arkema France, S.A.

72. **Arkema France S.A. ("Arkema France")** is a publicly traded foreign corporation with its principal place of business in Colombes, France.  Arkema France S.A. is the parent corporation of defendant, Arkema Inc.

73. Arkema France and Arkema Inc. are collectively referred to herein as "Arkema".

74. **AGC, Inc. f/k/a Asahi Glass Co. Ltd. ("AGC")** is a foreign corporation organized under the laws of Japan, having a principal place of business in Tokyo, Japan.

75. AGC manufactures specialty chemicals. It offers glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

76. **Daikin Industries, Ltd.** is a corporation organized under the laws of Japan, having its principal place of business in Osaka, Japan.

77. **Daikin America, Inc.** is a corporation organized and existing under the laws of Delaware, having its principal place of business at 20 Olympic Drive, Orangeburg, New York 10962.

78. Daikin America, Inc. was established in 1991 and is a subsidiary of Daikin Industries Ltd.

79.    It is a developer and manufacturer of fluorochemical products, including fluoropolymers, fluoroelastomers, and fluorocarbon gas.

80.    Daikin Industries, Ltd. and Daikin America, Inc. are collectively referred to herein as "Daikin."

81.    **Dynax Corporation ("Dynax")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 79 Westchester Avenue, Pound Ridge, New York 10576 and an address for service of process at 103 Fairview Park Drive Elmsford, New York 10523-1544.

82.    On information and belief, Dynax (f/k/a Daikin-R/M Co, Ltd.) entered the AFFF business in 1991, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

83.    **Solvay Specialty Polymers, USA, LLC ("Solvay")** is a corporation organized and existing under the laws of Delaware, having a principal place of business at 4500 McGinnis Ferry Road, Alpharetta, GA 30005.

84.    **Amerex Corporation ("Amerex")** is a corporation having principal place of business at 7595 Gadsden Highway, Trussville, AL 35173.

85.    Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

86.    **Kidde-Fenwal, Inc. ("Kidde-Fenwal")** is a corporation organized under the laws of Delaware, having a principal place of business at One Financial Plaza, Hartford, Connecticut 06101. Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.) (collectively, "Kidde/Kidde Fire").

87.    Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

88.    **Kidde P.L.C., Inc. ("Kidde P.L.C.")** is a foreign corporation organized and existing under the laws of Delaware, having a principal place of business at One Carrier Place, Farmington, Connecticut 06034.

89.    **UTC Fire & Security Americas Corporation, Inc. ("UTC Fire")** is a North Carolina corporation, having a principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092.

90.    On information and belief, UTC Fire acquired Kidde P.L.C. in 1991 and joined it with Chubb.

91.    On information and belief, UTC Fire is a subsidiary of United Technologies Corporation.

92.    **United Technologies Corporation ("United Technologies")** is a foreign corporation organized and existing under the laws of Delaware, having a principal place of business at 8 Farm Springs Road, Farmington, Connecticut 06032.

93.    **Chubb Fire, Ltd. ("Chubb")** is a foreign private limited company, with offices at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. Upon information and belief, Chubb is registered in the United Kingdom with a registered number of 134210. Upon information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd., Chubb Security, PLC, Red Hawk Fire & Security, LLC, and/or Chubb National Foam, Inc.

94.    **Clariant Corporation ("Clariant")** is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

95.    On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, inc.

96.    **BASF Corporation, ("BASF")**, is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

97.    On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

98.    On information and belief, BASF Corporation is the successor in interest to Ciba, Inc., a Swiss specialty chemicals company.

## FACTUAL ALLEGATIONS AS TO ALL COUNTS

**A.**    **PFOA and PFOS and Their Risk to Public Health and the Environment**

99.    PFAS are chemical compounds containing fluorine and carbon. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

100.    The two most widely studied types of these substances are perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonate ("PFOS"), which each contain eight carbon atoms.

101.    PFOA and PFOS have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in

organisms and up the food chain; and (iii) toxic, meaning that they pose serious health risks to humans and animals.

102.    PFOA and PFOS easily dissolve in water, and thus they are mobile and easily spread in the environment. PFOA and PFOS also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

103.    PFOA and PFOS are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA and PFOS are thermally, chemically, and biologically stable. They resist degradation due to light, water, and biological processes.

104.    Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases as the substance travels up the food chain.

105.    PFOA and PFOS bioaccumulate/biomagnify in numerous ways. First, they are relatively stable once ingested, so that they bioaccumulate in individual organisms for significant periods of time. Because of this stability, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present. In humans, PFOA and PFOS remain in the body for years.

106.    PFOA and PFOS biomagnify up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA and/or PFOS.

107.    The chemical structure of PFOA and PFOS makes them resistant to breakdown or environmental degradation. As a result, they are persistent when released into the environment.

108.    Exposure to PFAS is toxic and poses serious health risks to humans and animals.

109.    PFAS are readily absorbed after consumption or inhalation, and accumulate primarily in the blood stream, kidney, and liver.

**B.    Defendants' Manufacture and Sale of PFAS Despite Known Risks**

110.    In the 1940's, 3M Company began using a process called electrochemical fluorination to create carbon-fluorine bonds, which are key components of PFAS.

111.    3M Company soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled 3M Company to develop a myriad of products that resist heat, stains, oil, and water. These products included older forms of Scotch Gard, which contained PFAS and when applied to fabric, furniture, and carpets protected against liquids and stains.

112.    Upon information and belief, by at least the 1970s, 3M Company knew or should have known that PFAS are mobile and persistent, bioaccumulative and biomagnifying, and toxic.

113.    In 1975, 3M Company concluded that PFOS was present in the blood of the general population. Since PFOS is not naturally occurring, this finding should have alerted 3M Company to the possibility that their products were a source of these chemicals. The finding also should have alerted 3M Company that PFOS is mobile, persistent, bioaccumulative, and biomagnifying, as those characteristics explain the absorption of PFOS in blood after contact with 3M's products.

114.    Upon information and belief, 3M Company concealed this knowledge from the public and government regulators its knowledge of the risk of harm posed by PFOS.

115.    In 1976, 3M Company found PFOA in the blood of its workers. This finding should have alerted 3M Company to the same issues raised by the findings regarding PFOS in the prior year.

116.    A 1978 study by 3M Company showed that PFOA reduced the survival rate of fathead minnow fish eggs. Other studies by 3M Company in 1978 showed that PFOS and PFOA are toxic to rats, and that PFOS is toxic to monkeys. In one study in 1978, all monkeys died within the first few days of being given food contaminated with PFOS.

117.    Studies by 3M Company after the 1970s also showed adverse effects from exposure to PFOA and PFOS. In a 1983 study, for example, 3M Company found that PFOS caused the growth of cancerous tumors in rats.

118.    A study proposal by 3M Company in 1983 stated that the resistance to degradation of PFOA and PFOS made them "potential candidates for environmental regulations, including further testing requirements under laws such as the Toxic Substances Control Act." 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, at p.6 (E. A. Reiner, ed. May 20, 1983).

119.    A 1997 material safety data sheet ("MSDS") for a non-AFFF product made by 3M Company listed its only ingredients as water, PFOA, and other per-fluoroalkyl substances and warned that the product includes "a chemical which can cause cancer." The MSDS cited "1983 and 1993 studies conducted jointly by 3M Company and DuPont" as support for this statement. On information and belief, 3M's MSDS's for AFFF, which contained PFOA, did not provide similar warnings.

120.    In an attempt to limit liability, 3M Company opted to stop producing PFAS in 2002 because it was aware of the looming chemical exposure and health effects on the public.

121.    Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of

injury to health or the environment." Toxic Substances Control Act ("TSCA") § 8(e), 15 U.S.C. § 2607(e).

122.    3M Company did not comply with its duty under TSCA, and, in April 2006, it agreed to pay EPA a penalty of more than $1.5 million for, among other things, its failure to disclose studies regarding PFAS dating back decades.

123.    DuPont also did not comply with its duty under TSCA and the Resource Conservation and Recovery Act (RCRA), and, in 2005, agreed to pay $10.25 million, the largest civil administrative penalty that EPA had ever obtained to that date under any federal statute. The TSCA violations of Section 8(e) specifically addressed the company's failure to report to EPA the substantial risks of PFOA.

**C.    Defendants' Manufacture and Sale of AFFF Despite Known Risks**

124.     In 1951, 3M began selling its PFAS to other chemical companies, including DuPont.

125.    Other companies, including Defendants, began manufacturing AFFF using PFAS that they produced themselves or purchased from other companies.

126.    Defendants voluntarily elected to include PFAS in their AFFF.

127.    Defendants knew or should have known that PFAS are highly soluble in water, extremely mobile, persistent, and very likely to contaminate drinking water wells and present significant risks to human health and welfare if released into the environment.

128.    Nevertheless, Defendants manufactured, marketed, and sold their AFFF with the knowledge that PFAS would be released into the environment in firefighting training and rescue exercises, inadvertent releases, as well as in emergencies.

129.    Upon information and belief, instructions, labels and material safety data sheets for AFFF provided by Defendants did not, for significant time periods, fully describe the health and

environmental hazards of AFFF, which Defendants knew or should have known at the time of distribution.

130.    Upon information and belief, Defendants knew of these health and environmental hazards for years, yet failed to warn the users and other sensitive receptors, such as public water providers.

131.    AFFF concentrate containing PFAS forms foam when it is mixed with water and ejected from a nozzle. That foam is then sprayed so that it coats the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier to extinguish the vapors on fire. A film also forms to smother the fire after the foam has dissipated.

132.    Civilian and military airports, fire departments and industrial facilities, unaware of the environmental and health risk and hazards of using Defendants' AFFF, used AFFF containing PFAS for decades for firefighting and training.

133.    These sites have been linked to the widespread contamination of surface and groundwater, as well as public drinking water wells throughout the country with PFAS.

134.    On information and belief, all Defendants knew or should have known that in its intended and/or common use, AFFF containing PFAS would very likely injure and/or threaten public health and the environment.

135.    On information and belief, this knowledge was accessible to all Defendants. For example, in 1970 a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following Defendants are and/or were members of this trade association: 3M Company, Tyco/Ansul, Chemguard, and National Foam/Angus.

136.    Additionally, on information and belief, all Defendants knew or should have known that their AFFF products and the PFAS the products contained, easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and tend to bioaccumulate, because studies regarding the presence of substances with carbon-fluorine bonds in the blood of the general population were publicly available beginning in, at least, 1976.

137.    In or about 1977, Tyco/Ansul was also aware of the environmental and toxic concerns of its AFFF and undertook a study and investigation on more environmentally improved AFFF.

138.    There is no natural sink for AFFF containing PFAS. Except for incineration above 10,000 degrees, Defendants' PFAS will eventually accumulate in the water and all living organisms - including the blood and organs of humans and livestock.

139.    Plumes of PFAS can persist in underground aquifers for many decades. Once the plume reaches a well, it continues to contaminate the water drawn from that well.

D.    **AFFF Containing PFAS is Fungible and Commingled in the Groundwater**

140.    Once it has been released to the environment and groundwater, AFFF containing PFAS, lacks characteristics that would enable identification of the company that manufactured that particular batch of AFFF.

141.    The process of manufacture and distribution of AFFF, including that which contains PFAS, sometimes includes complex arrangements whereby Defendants sell product for delivery through specific military bases and/or third-party logistic intermediaries throughout the country.

142.    A subsurface plume, even if it comes from a single location, such as a retention fire training area, most likely originates from mixed batches of AFFF containing PFAS coming from different manufacturers.

143.    Because precise identification of the specific manufacturer of any given AFFF product that was the source of PFAS in the groundwater is impossible, Plaintiff must pursue all Defendants, jointly and severally, for those indivisible injuries which Defendants have collectively visited upon Plaintiff.

144.    Defendants are also jointly and severally liable because they conspired to conceal the true toxic nature of PFAS, to profit from the use of AFFF containing PFAS, at the expense of Plaintiff and others similarly situated, and to attempt to avoid liability for their contamination of the environment.

E.    **Health Effects of PFOS and PFOA Exposure**

145.    As discussed above, none of the Defendants complied with their obligations to notify the EPA about the "substantial risk of injury to health or the environment" posed by their PFAS products. *See* TSCA § 8(e).

146. In or around 1998, EPA began investigating the safety of PFAS after some limited disclosures by 3M Company and others.

147. PFAS have been found to bioaccumulate in humans and animals. In 2005, the U.S. Department of Health and Human Services found that "human exposure to PFOA and PFOS lead to the buildup of these chemicals in the body."

148. Because of its toxicity, eight major PFOA manufacturers agreed in 2006 to participate in the EPA's PFOA Stewardship Program. The participating companies made voluntary commitments to reduce product content and facility emissions of PFOA and related chemicals by 95% no later than 2010.

149. The recommendations in the EPA's health advisories evolved as they learned more about the dangers and toxicity of PFAS.

150. On January 8, 2009, the EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. See, Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)[2].

151. Many parties have studied PFOA, also known as C8, including a Science Panel formed out of a class action settlement arising from contamination from DuPont's Washington Works located in Wood County, West Virginia.

152. The C8 panel consisted of three epidemiologists specifically tasked with determining whether there was a probable link between PFOA exposure and human diseases.

---

[2] , *https://www.epa.gov/sites/productionlfiles/2015 0-9/documents/pfoa- pfos-provisional.pdf*, at p. 1, n. 1 (last visited June 5, 2018)

153.    In 2012, the panel found probable links between PFOA and kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, pregnancy induced hypertension (including preeclampsia), and hypercholesterolemia.

154.    Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and high cholesterol.

155.    In laboratory testing on animals, PFOA and PFOS have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

156.    The injuries caused by PFAS can arise months or years after exposure.

157.    Even after the C8 Science Panel publicly announced that human exposure to 50 parts per trillion, or more, of PFOA in drinking water for one year or longer had "probable links" with certain human diseases, including kidney cancer, testicular cancer, ulcerative colitis, thyroid disease, preeclampsia, and medically-diagnosed high cholesterol, Defendants repeatedly assured and represented to governmental entities, their customers, and the public (and continue to do so) that the presence of PFOA in human blood at the levels found within the United States presents no risk of harm and is of no legal, toxicological, or medical significance of any kind.

158.    Furthermore, Defendants have represented to and assured such governmental entities, their customers, and the public (and continue to do so) that the work of the independent C8 Science Panel was inadequate to satisfy the standards of Defendants to prove such adverse effects upon and/or any risk to humans with respect to PFOA in human blood.

159.    At all relevant times, Defendants, through their acts and/or omissions, controlled, minimized, trivialized, manipulated, and/or otherwise influenced the information that was

published in peer-review journals, released by any governmental entity, and/or otherwise made available to the public relating to PFAS in human blood and any alleged adverse impacts and/or risks associated therewith, effectively preventing the public from discovering the existence and extent of any injuries/harm as alleged herein.

160.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[3]

## F.    Federal and State Standards for PFAS

161.    On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt (parts per trillion). See, Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS, 81 Fed. Reg. 33, 250-51 (May 25, 2016).

162.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.

---

[3] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environmental Health Perspectives 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

163.    Effective April 25, 2016, the NYSDEC added PFOS and PFOA to the New York State 6 NYCRR Part 597 list of hazardous substances, making it hazardous waste pursuant to New York State Environmental Conservation Law Article 27, Title 13 and 6 NYCRR Part 375.

164.    In 2017 the Drinking Water Quality Council ("DWQC") was created with direction to recommend maximum contaminant levels ("MCLs") for emerging contaminants, including PFOA and PFOS. The DWQC recommended MCLs to the New York State Department of Health ("NYSDOH") an MCL of 10.0 ppt or 0.0000100 milligrams per liter (mg/L) for PFOA and 10.0 ppt or 0.0000100 mg/L for PFOS.[4]

165.    Adopting the recommendations provided by DWQC, the NYSDOH is now proposing to amend 10 NYCRR Part 5 to establish MCLs of 10 ppt for PFOA and PFOS as individual contaminants.  These MCLs would apply to all public water supplies.

166.    Although the proposed regulations do not apply to private wells, the MCLs will be used by the NYSDEC as guidance to determine whether a private well is contaminated by PFOA or PFOS.

167.    Effective on March 22, 2020, new section 159-b of the New York Executive Law now bans the manufacture or use in New York of firefighting foam containing PFAS, except in certain limited situations. The bill provides a 2-year window before the ban takes effect and requires written notification of any PFAS found in firefighting personal protective equipment at the time of sale.

## G.    Market Share Liability, Alternative Liability, Concert of Action, Enterprise Liability

---

[4] Notice of Adoption, Amendment of Subpart 5-1 of Title 10 NYCRR Maximum Contaminant Levels (MCLs) (July 24, 2019) https://regs.health.ny.gov/sites/default/files/proposed-regulations/Maximum%20Contaminant%20Levels%20%28MCLs%29.pdf.

168.    Defendants in this action are manufacturers that control a substantial share of the market for AFFF-containing PFOA and/or PFOS in the United States and are jointly responsible for the contamination of the environment including, but not limited to, soil, surface water, and/or groundwater and for causing the damages complained of in this Complaint.

169.    Enterprise liability attaches to all Defendants and the liability of each should be assigned according to its percentage of the market for AFFF-containing PFOA/S at issue in this Complaint.

170.    PFOA and PFOS are fungible; it is impossible to identify the exact Defendant who manufactured any given batch of AFFF containing PFOA and/or PFOS found free in the air, soil, and/or groundwater, and, each of these Defendants participated in a state-wide and national market for AFFF containing PFOA and/or PFOS during the relevant time.

171.    Concert of action liability attaches to all Defendants, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortuously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF-containing PFOA and/or PFOS.

172.    Enterprise liability attaches to all of the named Defendants for casting defective products into the stream of commerce.

## CLASS ACTION ALLEGATIONS

173.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully stated herein.

174.    Plaintiffs and the Classes bring this action and seek to certify and maintain it as a class action pursuant to Article 9 of the New York Civil Practice Law and Rules, Section 901 and Fed. R. Civ. P. Rule 23, on behalf of Plaintiff and on behalf of all other similarly situated municipal

owners of FTFs as members of the proposed Classes, subject to amendment and additional discovery as follows:

    a.    All municipal public entities which own FTFs within the State of New York and which have incurred or will incur financial damages as a result of PFAS contamination associated with the use and/or storage of AFFF at these facilities (the "Impacted FTF Owner Class").

    b.    All municipal public entities which own FTFs within the State of New York which will conduct testing to monitor for PFAS contamination associated with the use and/or storage of AFFF at these facilities (the "Monitoring Class").

175.    Plaintiff is a member of the proposed Impacted FTF Owner Class and Monitoring Class that it seeks to represent. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements.

176.    Excluded from the Classes are:

    a.    Defendants, including any entity or division in which Defendants have a controlling interest, along with their legal representative, employees, officers, directors, assigns, heirs, successors, and wholly or partly owned subsidiaries or affiliates;

    b.    the Judge to whom this case is assigned, the Judge's staff, and the Judge's immediate family who may have an ownership interest in a FTF;

    c.    any class counsel or their immediate family members who may have an ownership interest in a FTF;

    d.    FTFs that have PFOA and/or PFOS contamination from sources other than AFFF; and

177.    Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into additional subclasses, or modified in any other way.

**A.    Numerosity and Ascertainability**

178.    This action meets the numerosity requirement given that the large number of publicly owned FTFs in the State of New York which are contaminated with PFAS associated with

the use and/or storage of AFFF, making individual joinder of Class Members' respective claims impracticable. While the exact number of class members is not yet known, a precise number can be ascertained from the State of New York, DEC and/or the DOH, through the public records, and/or through other appropriate discovery.

179.    The resolution of the claims of the class members in a single action will provide substantial benefits to all parties and the Court. It is expected that the class members will number in the hundreds.

180.    Class Members can be notified of the pendency of this action by Court-approved notice methods.

**B.    Typicality**

181.    Pursuant to the New York Civil Practice Law and Rules Section 901 and Fed. R. Civ. P. Rule 23, Plaintiff's claims are typical of the claims of Class Members, and arise from the same course of conduct by Defendants.

182.    The FTFs of Plaintiff and the Class Members have been contaminated as a result of Defendants' misconduct related to the introduction of PFOA and PFOS into the surface and/or groundwater at these facilities from the use and/or storage of AFFF.

183.    Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members. The relief Plaintiff seeks is typical of the relief sought for absent Class Members. Furthermore, the factual bases of Defendants' actions and misconduct are common to all Class Members and represent a common thread of misconduct resulting in common injury to all Class Members.

**C.    Adequacy of Representation**

184.    Proposed Class Representative will serve as a fair and adequate Class Representative, as its interests, as well as the interests of its counsel, do not conflict with the interest of other Members of the Class they seek to represent. Further, Class Representative has retained counsel competent and well experienced in class action litigation and environmental tort litigation.

185.    The Class Representative and its counsel are committed to vigorously prosecuting this action on behalf of the Classes and they have the financial resources to do so. Neither the Class Representative nor its counsel has interests adverse to the Classes.

### D.    Predominance of Common Issues

186.    There are numerous questions of law and fact common to Plaintiff and Class Members that predominate over any question affecting only individual Class Members, making it appropriate to bring this action under CPLR §901 and Fed. R. Civ. P. Rule 23. The answers to these common questions will advance resolution of the litigation as to all Class Members. These common legal and factual issues include the following:

    a.    Whether Defendants engaged in the conduct alleged herein;

    b.    Whether Defendants knew or should have known that their manufacture of AFFF containing PFOA and PFOS was unreasonably dangerous;

    c.    Whether Defendants knew or should have known that their AFFF contained persistent, stable and mobile chemicals that were likely to contaminate surface and/or groundwater;

    d.    Whether Defendants failed to sufficiently warn users of the potential for harm that resulted from the foreseeable use of their products;

    e.    Whether Defendants became aware of health and environmental harm caused by PFOA and PFOS in their AFFF products and failed to warn users and Plaintiff and the Class of same;

    f.    The extent to which Defendants knew about the PFOA and PFOS contamination in the water around facilities that used and/or trained with AFFF;

g.  Whether the Defendants owed a duty to the Plaintiff and the Classes to refrain from the actions that caused the contamination of the surface and/or groundwater at FTFs with PFOA and PFOS;

h.  Whether Defendants made unlawful and misleading representations or material omissions with respect to the health and environmental impacts of PFOA and PFOS;

i.  Whether Plaintiff and Class Members are entitled to damages and other monetary relief, including but not limited to punitive damages, and if so, in what amount;

j.  Whether the members of the Classes have sustained damages and the proper measure of damages; and

k.  Whether Defendants are strictly liable to Plaintiff and the Classes for their actions.

**E.    Superiority**

187.    The class action mechanism is superior to any other available means of the fair and efficient adjudication of this case. Further, no unusual difficulties are likely to be encountered in the management of this class action. Given the number of FTFs impacted by Defendants' conduct and those that will require above-and-beyond monitoring, it is impracticable for Plaintiff and the Classes to individually litigate their respective claims for Defendants' complained of conduct as to do so would risk inconsistent or contradictory judgments and increase delays and expense to both parties and the court system. Therefore, the class action mechanism presents considerably less management challenges and provides the efficiency of a single adjudication and comprehensive oversight by a single court.

**CAUSES OF ACTION**

**As and for a First Cause of Action:**

**NEGLIGENCE**

188.    Plaintiff and the Classes hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

189.    Defendants knew or should have known that exposure to PFAS are hazardous to the environment and to human health.

190.    Defendants also knew or should have known that PFAS are highly soluble in water, highly mobile, extremely persistent in the environment, and high likely to contaminate soil, surface water, and/or groundwater supplies if released into the environment.

191.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, distributing, and/or selling AFFF containing PFAS would result in the contamination of the Rockland County Fire Training Center and other FTFs and their surrounding areas.

192.    Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be used in training exercises and/or emergency situations at FTFs, such as the Site, in a manner that dangerous chemicals would be released into the environment.

193.    Further, Defendants marketed and sold their products with knowledge that AFFF containing large quantities of toxic PFAS would be stored at FTFs, such as the Site, and that the storage systems could be used and maintained in a manner that dangerous chemicals would be released into the environment.

194.    Knowing of the dangerous and hazardous properties of AFFF and the manner in which AFFF would be used, stored, maintained, and released at FTFs, such as the Site, it was foreseeable that AFFF would contaminate the surrounding environment, surface water, soil, and/or groundwater.

195.    Defendants therefore knew or should have known that safety precautions would be required to prevent the release of PFOA and PFOS into the surrounding environment, surface

water, soil, and/or groundwater.

196. Defendants owed a duty to Plaintiff and the Classes to act reasonably and not place inherently dangerous AFFF into the marketplace when its release into the environment, surface water, soil, and/or groundwater was imminent and certain.

197. Defendants owed a duty to Plaintiff and the Classes not to contaminate the surrounding environment, surface water, soil, and/or groundwater with AFFF containing toxic PFAS.

198. Defendants further breached their duty by failing to prevent the release of the above contaminants at the Site and at other FTFs and by failing to prevent the spread of this contamination into the surrounding areas.

199. Defendants, as manufacturers, marketers, and sellers of AFFF, owed Plaintiff and the Classes a duty to exercise reasonable care to ensure that AFFF was manufactured, marketed, and sold in such a way as to ensure that the end users of AFFF were aware of the potential harm PFOA and PFOS can cause to human health and the environment.

200. As manufacturers, Defendants were in the best position to provide adequate instructions, proper labeling, and sufficient warnings about their AFFF products to prevent the release of PFOS and PFOA into the surrounding environment.

201. Defendants had a duty to warn Plaintiff and the Classes of the hazards associated with AFFF, containing PFAS, entering and poisoning the environment, surface water, soil, and/or groundwater.

202. Upon learning of the release of the contaminants, all Defendants owed a duty to warn and notify Plaintiff and the Classes of the release of the contamination before it caused injury and/or to act reasonably to minimize the damages to these parties.

203.     Defendants breached their duty by allowing PFOA and PFOS to be released into the Site and surrounding area that is the source of drinking water for public and private wells and through their failure to warn and notify the end users of AFFF of the danger that PFOA and PFOS would enter into the environment, surface water, soil, and/or groundwater.

204.     As such, the Defendants, negligently, grossly negligently, recklessly, willfully, wantonly, and/or intentionally breached their legal duties to the Plaintiff and the Classes, causing the contamination of the Site and other FTFs with unsafe and dangerous levels of PFOA and PFOS.

205.     Defendants further breached the duties owed to the Plaintiff and the Classes by failing to take reasonable, adequate, and sufficient steps or actions to eliminate, correct, or remedy any contamination after it occurred.

206.     Defendants' breaches of their duties were the direct and proximate causes of the damages alleged herein.

207.     As a result of Defendants' breach of their duty to timely notify the Plaintiff and the Classes and act reasonably in warning of the danger and presence of PFOS and PFOA, Plaintiff and the Classes were forestalled from undertaking effective and immediate remedial measures.

208.     Plaintiff and the Classes have suffered foreseeable damages as a proximate result of Defendants' negligent breach of their duties as set forth above. At the time Defendants breached their duties to Plaintiff and the Classes, Defendants' acts and/or failures to act posed recognizable and foreseeable possibilities of danger to these parties.

209.     As a direct and proximate result of Defendants' negligent breach of their duties as set forth above, Plaintiff has suffered foreseeable damages and has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

210.    As a direct and proximate result of Defendants' acts and omissions and the resulting contamination, Plaintiff and the Classes have suffered damages, including but not limited the costs incurred and to be incurred in responding to the contamination to the Site, continued monitoring, remediating off-site impacts, and legal costs.

211.    Defendants knew it was substantially certain that their acts and omissions described above would cause injury and damage by contaminating the Site, other FTFs, and nearby drinking water supplies with AFFF containing PFOA and/or PFOS. Defendants' actions and omissions were done with actual malice, and in wanton and willful and/or reckless disregard for Plaintiff's and the Classes' rights.

212.     Defendants are jointly and severally liable for all such damages, and Plaintiff and the Classes are entitled to recover all such damages and other relief as set forth below.

213.    Therefore, Plaintiff and the Classes request an award of punitive damages in an amount sufficient to punish these Defendants and that fairly reflects the aggravating circumstances alleged herein.

214.    As a direct result of the foregoing, Plaintiff and the Classes seek compensatory damages in a sum to be determined by a jury at the time of trial.

### As and for a Second Cause of Action:

### PRODUCTS LIABILITY – FAILURE TO WARN

215.    Plaintiff and the Classes hereby repeat, reallege, and reassert each and every allegation in the preceding paragraphs as if fully restated herein.

216.    Defendants knew or should have known that exposure to PFOA and PFOS was hazardous to the environment and human health.

217.    Defendants knew or should have known that the manner in which they were

manufacturing, marketing, and selling AFFF, containing PFAS, was hazardous to the environment and human health.

218.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFAS would result in the contamination of the Site.

219.    Knowing of the dangerous, hazardous and toxic properties of the AFFF, Defendants had the duty to warn of the hazards associated with AFFF entering and poisoning the environment, surface water, soil, and/or groundwater.

220.    Defendants failed to provide sufficient warning to the end users and the public of AFFF, including those at the Site and other FTFs, that the use and storage of Defendants' product would cause the product to be released into the environment and cause the contamination of the environment, surface water, soil, and/or groundwater, with PFAS, including but not limited to PFOA/S.

221.    Adequate instructions and warnings on the AFFF products could have reduced or avoided these foreseeable risks of harm to the environment and the threat to public health.

222.    Had Defendants provided adequate warnings, Plaintiff and the Classes could have taken measures to avoid or lessen the exposure.

223.    Had Defendants provided adequate warnings, the end users of AFFF, including those at the Site and other FTFs, Plaintiff and the Classes could have taken steps to reduce or prevent the release of toxic PFAS into the environment, surface water, soil, and/or groundwater.

224.    Defendants' failure to warn was a direct and proximate cause of the environmental impact from PFOA and PFOS that came from the use, storage and disposal of AFFF at the Site and other FTFs.

225.    As such, Defendants' failure to provide adequate and sufficient warnings for the AFFF that they manufactured, marketed, and sold renders their AFFF a defective product.

226.    As a result of Defendants' conduct and the resulting contamination, Plaintiff and the Classes have been forced to incur significant costs, including but not limited to the costs incurred and to be incurred in responding to the contamination at the Site and other FTFs and will incur significant future costs of repair, restoration, investigative costs, engineering costs, sampling costs, and legal costs.

227.    As a result of Defendants' manufacture, sale, or distribution of a defective product, Defendants are strictly liable in damages to Plaintiff and the Classes.

228.    Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff and the Classes.

**As and for a Third Cause of Action:**

**PRODUCTS LIABILITY – DEFECTIVE DESIGN**

229.    Plaintiff and the Classes hereby repeat, reallege, and reassert each and every allegation in the preceding paragraphs as if fully restated herein.

230.    Defendants knew or should have known that exposure to PFOA and/or PFOS was hazardous to the environment and human health.

231.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF, containing PFOA and/or PFOS, was hazardous to the environment and human health.

232.    Defendants knew or should have known that the manner in which they were manufacturing, marketing, and selling AFFF containing PFOA and/or PFOS would result in the contamination of the Site and other FTFs.

233.    Knowing of the dangerous and hazardous properties of the AFFF, Defendants could have manufactured, marketed, and sold alternative designs or formulations of AFFF that did not contain PFAS, including PFOA and/or PFOS.

234.    Alternative designs and/or formulations of AFFF were already available, practical, and technologically feasible.

235.    The use of these alternative designs would have reduced or prevented the reasonably foreseeable harm to environment that was caused by the Defendants' manufacture, marketing, and sale of AFFF that contained PFOA and/or PFOS.

236.    The AFFF that was manufactured, marketed, and sold by the Defendants contained PFOA and/or PFOS, chemicals so toxic and dangerous to the environment, mobile, and persistent, that the act of designing, formulating, manufacturing, marketing, and selling this product was unreasonably dangerous under the circumstances.

237.    The AFFF manufactured, marketed, and sold by the Defendants was defectively designed as the foreseeable risk of harm could have been reduced or eliminated by the adoption of a reasonable, alternative design that was not unreasonably dangerous.

238.    Defendants' defective design and formulation of AFFF was a direct and proximate cause of the environmental impacts from PFOA and PFOS, that came from the use, storage and release of AFFF at the Site.

239.    As a direct result of Defendants' defective design and formulation of AFFF and the resulting contamination, the Plaintiff and the Classes have been forced to incur significant costs including but not limited to the costs incurred and to be incurred in responding to the contamination and will incur future costs, including but not limited to, the cost of repair or restoration, investigative costs, engineering costs, sampling and monitoring costs, and legal costs.

240.     As a result of Defendants' design and formulation of a defective product, Defendants are strictly liable in damages to Plaintiff and the Classes.

241.     Defendants' acts were willful, wanton, reckless and/or conducted with a reckless indifference to the rights of Plaintiff and the Classes.

**As and for a Fourth Cause of Action:**

**VIOLATION OF NEW YORK UNIFORM FRAUDULENT CONVEYANCE ACT**

**(Against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc. and DuPont de Nemours, Inc.)**

242.     Plaintiff and the Classes hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

243.     Plaintiff and the Classes seek equitable and other relief pursuant to the Uniform Fraudulent Conveyance Act (UFCA) as adopted by the State of New York, against E. I. DuPont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the UFCA Defendants). C.R.S. NY CLS Dr & Cr, Art 10 §§270-281.

244.     Under the UFCA: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." NY CLS Dr & Cr §273. "Every conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment." NY CLS Dr & Cr §273-a. "Every conveyance made without fair consideration

when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent." NY CLS Dr & Cr §274. "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §275.  "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." NY CLS Dr & Cr §276.

245.    The UFCA Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (c) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

246.    UFCA Defendants engaged in acts in furtherance of a scheme to transfer E. I. DuPont de Nemours and Company's assets out of the reach of parties such as Plaintiff and the Classes that have been damaged as a result of the UFCA Defendants' conduct, omissions, and actions described in this Complaint.

247.    It is primarily E. I. DuPont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFAS and PFAS for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and, through normal and foreseen use, would

contaminate drinking water supplies.

248.    As a result of the transfer of assets and liabilities described in this Complaint, the UFCA Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS for use in AFFF.

249.    At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. DuPont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFAS and/or PFAS compounds for use in AFFF.

250.    The UFCA Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. DuPont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

251.    At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

252.    Pursuant to C.R.S. NY CLS Dr & Cr, Art 10 §§270-281,  Plaintiff and the Classes seek avoidance of the transfer of E. I. DuPont de Nemours and Company's liabilities for the claims brought in this Complaint and to the UFCA Defendants liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

253.    Plaintiff and the Classes further seek all other rights and remedies that may be available to it under UFCA, including prejudgment remedies as available under applicable law, as may be necessary to fully compensate Plaintiff and the Classes for the damages and injuries they

have suffered as alleged in this Complaint.

### As and for a Fifth Cause of Action:

### NEGLIGENCE PER SE

254.    Plaintiff and the Classes reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

255.    Defendants had a duty to comply with applicable laws, regulations and guidelines applicable to them.

256.    Such laws, regulations and guidelines applicable to Defendants include but are not limited to: 6 NYCRR §§ 370 *et seq*. and 6 NYCRR § 372.2

257.    Upon information and belief, Defendants failed to manufacture AFFF containing PFOA and PFOS in compliance with the applicable laws and regulations relevant to air, soil and water quality protection.

258.    These laws and regulations were intended for the protection of the environment and public health.

259.    Plaintiff and the Classes are members of the group(s) whose protection was intended by the drafters of such laws and regulations.

260.    These violations were a direct and proximate cause of the substantial damages and imminent, substantial and impending harm to the Site, other FTFs and their surrounding areas.

261.    The risk of damages and the imminent, substantial and impending harm to Plaintiff and the Classes is precisely the types of injuries the applicable laws were designed to prevent.

262.    Violation of these laws and regulations thereby constitutes *per se* negligence. The amount of damages for the injuries will be established at the time of trial and said amount exceeds the jurisdictional limits of all of the lower courts.

### As and for a Sixth Cause of Action:

### PUBLIC NUISANCE

263.    Plaintiff and the Classes hereby repeat, reallege, and reassert each and every allegation in the preceding paragraphs as if fully restated herein.

264.    At all times relevant to the present cause of action, Defendants were manufacturers of AFFF containing PFOA and/or PFOS, that was used, discharged or released in a dangerous way, and/or otherwise caused PFAS contamination at the Site and other FTFs.

265.    Defendants have manufactured AFFF containing PFOA and/or PFOS in a manner that created a public nuisance and that unreasonably endangers or injures the Plaintiff and the Classes, causing inconvenience and annoyance.

266.    The improper use, handling, storage, release, discharge, and/or disposal of Defendants' AFFF containing PFOS and/or PFOA at the Site and other FTFs has contaminated the environment, surface water, soil, and/or groundwater and the County of Rockland's and the Class Members' natural resources, including the ground water supply of drinking water wells, thus causing a public nuisance.

267.    The above-described affirmative, voluntary, and intentional acts were performed with the reckless disregard of the potential for PFOA and/or PFOS to be disbursed through the groundwater.

268.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOS and/or PFOA to be released into the groundwater in and around the Site, which is the drinking water supply for the County of Rockland, interfering with the health, safety or comfort of a considerable number of persons.

269.    The introduction of unknown quantities of PFOA and PFOS into the environment, surface water, soil, and/or groundwater at the Site and at other FTFs unreasonably interfered with their use, such that it is offensive and has caused significant inconvenience or annoyance.

270.    The potential danger from the contamination at the Site and at other FTFs has caused the Plaintiff and the Classes significant inconvenience and expense.

271.    Defendants are strictly, jointly, and severally liable to the Plaintiff and the Classes for all resulting damages, including the costs incurred and to be incurred in responding to the PFAS contamination at the Site and at other FTFs.

272.    On information and belief, Defendants' conduct involved wanton, willful, and/or conscious and reckless disregard for the health, safety, property, and rights of others. The Court should award Plaintiff and the Classes punitive damages in an amount sufficient to deter and punish such conduct.

273.    As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiff and the Classes have suffered damages from PFAS contamination of the environment, surface water, soil, and/or groundwater, including the costs incurred and to be incurred in responding to the contamination from PFAS at the Site and other FTFs. This includes, but is not limited to, past costs of investigation, remediation, and future costs of repair and/or restoration, investigative costs, engineering costs, sampling and monitoring costs, and legal costs.

274.    As a direct result of the foregoing, Plaintiff seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**Claim for Punitive Damages**

275.    Plaintiff and the Classes hereby repeat, reallege, and reiterate each and every

allegation in the preceding paragraphs as if fully restated herein.

276.    At all times relevant to the present cause of action, Defendants manufactured, marketed, and sold the AFFF that was used at the Site and at other FTFs, that resulted in the contamination of the environment, surface water, soil, and/or groundwater.

277.    At the time the above-described, affirmative, voluntary, and intentional acts were performed by Defendants, Defendants had good reason to know or expect that large quantities of PFOA and PFOS would and/or could be introduced into the environment, surface water, soil, and/or groundwater causing contamination at the site and surrounding area(s).

278.    Defendants' negligent, reckless, willful, and/or wanton actions and/or intentional failures to act caused an unknown quantity of PFOA and/or PFOS to be released into the environment, surface water, soil, and/or groundwater.

279.    The conduct of Defendants, including but not limited to:

a.    issuing no warnings and failing to divulge material information concerning the release of PFAS, including but not limited to PFOA and PFOS;

b.    knowing of the probability of long-lasting water contamination, including specifically high risks to aquifers and groundwater posed by their AFFF products containing PFOA/PFOS, demonstrating an outrageous conscious disregard for the safety of Plaintiff's and the Classes' residents, with implied malice and oppression, for which punitive and exemplary damages should be imposed; and

c.    knowing of the certainty of long-lasting water contamination, including specifically high risks to aquifers and groundwater by toxic products containing PFAS, demonstrating an outrageous conscious disregard for the safety of Plaintiff's and the Classes' residents, with implied malice and oppression.

280.    Defendants' willful, wanton, malicious, and/or reckless conduct includes, but is not limited to, Defendants' failure to take all reasonable measures to ensure AFFF containing PFAS would be effectively disposed of and not discharged into the surrounding environment where it would inevitably contaminate the Site, other FTFs, and their surrounding areas.

281.    Defendants have caused great harm to Plaintiff and the Classes, who have incurred costs in responding to the contamination from PFAS, PFOA will continue to incur costs, and will incur future costs, including but not limited to, the cost of repair or restoration, investigative costs, engineering costs, sampling and monitoring costs, and legal costs.

282.    Defendants have demonstrated an outrageous conscious disregard for the environment and acted with implied malice, warranting the imposition of punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff and the Classes demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.   Compensatory damages that exceed the jurisdictional limit of this court;

B.   Punitive damages that exceed the jurisdictional limit of this court;

C.   Reasonable fees for attorneys and expert witnesses;

D.   Costs and disbursements of this lawsuit;

E.   Interest on the damages according to law; and

F.   Any other and further relief as the Court deems just, proper and equitable

**JURY DEMAND**

Plaintiff and the Classes demand a trial by jury of all claims asserted in this Complaint.

Dated:  New York, New York
        February 4, 2020

Respectfully submitted,

By: /s/ Paul Napoli
Hunter J. Shkolnik, Esq.
Paul J. Napoli, Esq.
Patrick J. Lanciotti, Esq.
360 Lexington Avenue, 11th
New York, New York 10017
(212) 397-1000
hunter@napolilaw.com
pnapoli@napolilaw.com
planciotti@napolilaw.com

## VERIFICATION

I, PAUL NAPOLI**,** am an attorney duly admitted to practice law in the Courts of this State, and I affirm the following under penalties of perjury:

I am the attorney for the Plaintiff in the above entitled action. I have read the foregoing **SUMMONS & VERIFIED COMPLAINT** and know the contents thereof, and upon information and belief, affirmant believes after an inquiry reasonable under the circumstances, the matters alleged herein to be true, and that the contentions herein are not frivolous, as that term is defined in 22 NYCRR § 130-1.1(c).

The reason this verification is made by affirmant and not by Plaintiff is that the Plaintiff herein reside in a County other than the County in which I maintain my offices.

 The source of affirmant's information and the grounds of his/her belief are communications, papers, reports and investigations contained in the file maintained by this office.

Dated: Melville, New York
        February 4, 2020

s/ Paul J. Napoli
_____
Paul J. Napoli
